**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

THAD J. ZANDER,

     *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL
SECURITY,

     *Defendant*.

_____/

CASE NO. 19-13320

HON. LAURIE J. MICHELSON
DISTRICT JUDGE

HON. PATRICIA T. MORRIS
MAGISTRATE JUDGE

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 13, 15)

## I.   RECOMMENDATION

Plaintiff Thad J. Zander challenges Defendant Commissioner of Social Security's final decision denying his claims for Title II Disability Insurance Benefits ("DIB"). (ECF No. 1.) The case was referred to me for review. (ECF No. 3); *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3). For the reasons below, I conclude that substantial evidence does not support the Commissioner's decision. Accordingly, I recommend **GRANTING** Plaintiff's Motion for Summary Judgment, (ECF No. 13), **DENYING** the Commissioner's Motion, (ECF No. 15), and that the case be remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g).

1

## II.   <u>REPORT</u>

### A.   **Introduction and Procedural History**

Plaintiff's application for DIB was filed on May 16, 2014. (ECF No. 11-7, PageID.317.) He alleges that the onset date of his disability was January 1, 2014. (*Id.*) The Commissioner denied the claim. (ECF No. 11-5, PageID.214–17.) Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which occurred on March 15, 2016. (ECF No. 11-3, PageID.123–76.) The ALJ issued a decision on June 9, 2016. (ECF No. 11-4, PageID.188–202.) Subsequently, after Plaintiff's appeal of the ALJ's decision, the Appeals Council remanded the case to an ALJ to resolve issues concerning Plaintiff's prior disability claim and conflicting language about Plaintiff's ability to do past relevant work. (*Id.* at PageID.210–11.) Another hearing before an ALJ occurred on February 21, 2018 (ECF No. 11-2, PageID.74–121), and the ALJ rendered a decision on October 23, 2018. (*Id.* at PageID.50–66.) The Appeals Council denied review following the second ALJ decision on September 16, 2019. (*Id.* at PageID.36–38.) Plaintiff sought judicial review on November 11, 2019. (ECF No. 1, PageID.1–3.) The parties have filed cross-motions for summary judgment and briefing is complete. (ECF Nos. 13, 15, 17.)

### B.   **Standard of Review**

The court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x. 502, 506 (6th Cir. 2014) (internal quotation marks

omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286. (internal citations omitted).

## C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform

4

given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.   ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled[1]. (ECF No. 11-2, PageID.66.) At step one, the ALJ found the Plaintiff met the insured status requirements through December 31, 2017. (*Id.* at PageID.53.) Plaintiff, while he had some earned income, had not engaged in activity within the definition of substantial gainful activity from the alleged onset date of January 1, 2014 through the last-insured date of December 31, 2017. (*Id.*) At step two, the ALJ concluded that Plaintiff's severe impairments were neuromyelitis optica (NMO) with color blindness and photosensitivity, degenerative disc disease of the cervical spine, obesity, affective disorder, and attention deficit hyperactivity disorder (ADHD). (*Id.*) These impairments did not meet or medically equal a listed impairment in step three. (*Id.* at PageID.54.) Next, the ALJ found that the Plaintiff had the residual functional capacity ("RFC") to perform

> sedentary work as defined in 20 CFR 404.1567(a). He could lift and/or carry no more than 10 pounds at a time and could occasionally lift and/or carry articles such as docket files, ledgers, and small tools. The [Plaintiff] could

---

[1] For reference, in the 2016 ALJ decision denying Plaintiff's DIB application, Plaintiff's severe impairments were neuromyelitis optica ("NMO") with colorblindness, photosensitivity, and chronic pain syndrome, depression, and attention deficit hyperactivity disorder ("ADHD"). (ECF No.11-4, PageID.193.) Plaintiff's conditions did not meet or medically equal a listed impairment. (*Id.*) He had the RFC to perform

> sedentary work . . . except he can frequently balance and stoop. He can occasionally crouch and climb stairs, ramps, ladders, ropes, and scaffolds. He can never crawl. He can frequently reach overhead, finger, and feel (bilaterally). He must avoid all exposure to extreme heat, but he can have occasional exposure to extreme cold. He must avoid all use of unguarded moving mechanical parts and all exposure to unprotected heights. He cannot perform jobs that require color vision. He can handle large objects but not small ones.

(*Id.* at PageID.195.) Plaintiff was found to be unable to perform his past relevant work, and that he could perform a significant number of jobs in the national economy given his RFC, education, and work experience. (*Id.* at PageID.200.)

stand and/or walk for two hours per eight-hour workday and sit for eight hours per eight-hour workday. He could frequently, as opposed to constantly, reach, finger, and feel bilaterally. He could occasionally climb ramps and stairs, but he could never climb ladders, ropes, or scaffolds. He could frequently balance (as that term is defined in the DOT), frequently stoop, occasionally kneel, occasionally crouch, and never crawl. The [Plaintiff] was unable to work at a production rate pace, such as on an assembly line. He could never be exposed to dangerous machinery, hazardous heights, or extreme heat. He was unable to perform work involving the use of color vision. He was unable to perform in a work setting with spot lighting, such as in a concert setting. He could handle large objects, defined as greater than two inches in size. The [Plaintiff] was able to carry out simple instructions.

(*Id.* at PageID.56.) At step four, the ALJ found that Plaintiff could not perform past relevant work. (*Id.* at PageID.64.) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the economy, which included bench assembler, inserter, and parts checker. (*Id.* at PageID.65.) Accordingly, Plaintiff was found to be not disabled. (*Id.* at PageID.66.)

### E.   Administrative Record

#### 1.   Overview of Medical Evidence

Plaintiff appears to have extensive medical history; the documentation of early history may not entirely a part of this record, other than the ALJ's references to Plaintiff's previous filings for DIB.[2] Presently, Plaintiff alleges his disability condition began on January 1, 2014. (ECF No. 11-7, PageID.317.)

---

[2] In the June 2016 ALJ decision, the ALJ referenced Plaintiff's 2006 or 2007 claims, which did not go to a hearing. (ECF No. 11-4, PageID.191.) Later, the Appeals Council noted that, in fact, there was an unfavorable ALJ decision for Plaintiff in 2006. (*Id.* at PageID.210.) The Appeals Council remanded the case, in part, for "decisional language explaining which findings from the prior decision remain binding and which do not . . . ." (*Id.* at PageID.211.) Following the second ALJ hearing, the second ALJ indicated that there was an attempt "to locate the paper file for the 2006 decision and [discovery that] the prior file had been destroyed." (ECF No. 11-2, PageID.50.) After consultation with the Regional Chief Administrative Law Judge, the second ALJ "held a remand hearing, [] admitted evidence after this hearing

In February 2004, Dr. Surendra Kaul recommended that Plaintiff "not [] work for now" because he suffers from multiple sclerosis. (ECF No. 11-10, PageID.551.) His conditions "preclude him from working consistently." (*Id.*)

In February 2012, Plaintiff underwent an MRI of his brain and thoracic spine. (*Id.* at PageID.564, 566.) In the impressions, evidence of multiple sclerosis—increased signal intensity in the cervical spinal cord and the right centrum semiovale—remained not significantly changed (thoracic spine) or somewhat changed (brain) from the last examinations in 2010. (*Id.* at PageID.564, 567.)

In October 2013, Plaintiff presented to Dr. Jeffrey Potts and complained of sharp, constant midback pain that moderately limited activities. (*Id.* at PageID.534.) Plaintiff had normal and good posture; he had full range of motion and had non-tender cervical, thoracic, and lumbar spine. (*Id.* at PageID.536.) He had normal gait. (*Id.* at PageID.537.) Plaintiff was prescribed medication. (*Id.*)

In March 2014, Plaintiff complained of his multiple sclerosis symptoms to Dr. Potts. (*Id.* at PageID.516.) Plaintiff described symptoms as diffusely located and moderately limiting activities with flare ups. (*Id.*) Plaintiff experienced episodes daily, with dizziness, fatigue, headache, lightheadedness, slight nausea, and blurry vision. (*Id.*) Plaintiff denied stiffness, swelling, and muscle weakness. (*Id.*) Plaintiff had normal deep tendon reflexes and a normal gait. (*Id.* at PageID.519.)

---

to ensure the record was fully developed, and [] issued this decision after review of all available evidence of record." (*Id.* at PageID.51.)

In April 2014, Plaintiff underwent an EEG, and "no epileptiform activity was present during [these] recordings." (*Id.* at PageID.509.)[3] Also in April 2014, Plaintiff's MRI of his brain revealed "[m]oderate bilateral demyelination in keeping with multiple sclerosis" and that certain plaques indicated a foci of active demyelination. (*Id.* at PageID.510.) An MRI of his cervical spine showed stable findings compared to February 2012; stable inactive nonenhancing demyelinating plaque; bulging joint hypertrophy at C3-4 with some neural foraminal narrowing; only minimal central stenosis without cord compression. (*Id.* at PageID.512.)

In May 2014, Dr. Scott Vandenbelt reported that Plaintiff complained of occasional experience of diplopia, some blurring of vision, and "dark" vision that resolves itself. (ECF No. 11-10, PageID.498.) Dr. Vandenbelt's assessment included no signs of anterior optic neuropathy, and a note that it is difficult to correct intermittent diplopia when on presentation it is absent. (*Id.*) With Dr. Potts, Plaintiff reported continued issues related to multiple sclerosis and improving condition of low-back pain. (*Id.* at PageID.499.) Plaintiff had tender points on the left lumbar area. (*Id.* at PageID.502.) But he had normal deep tendon reflexes, normal gait and sensation, and he was alert and showed normal behavior. (*Id.*)

In July 2014, Dr. Mohammed Al-Qasmi provided a doctor's note prescribing that, because of Plaintiff's multiple sclerosis, he cannot work. (*Id.* at PageID.552.)

---

[3] This was the same result in November 2014. (ECF No. 11-11, PageID.623.)

In September 2014, Plaintiff reported to Dr. Al-Qasmi that he had increased difficulty with ambulation, generalized fatigue, and difficulty with concentration. (ECF No. 11-11, PageID.600.) Further, he reported stress and mood problems, and that he has been unable to work. (*Id.*) Also, he continues to experience numbness, tingling, and pain. (*Id.*) Plaintiff had symmetric strength in the upper extremities and symmetrically active reflexes. (*Id.* at PageID.601.) But he did have an antalgic ataxic gait. (*Id.*) Dr. Al-Qasmi stated, here, it was unclear if Plaintiff was experiencing a flare up or an infection related to a recent surgery. (*Id.*) Plaintiff's medication was changed following this appointment. (*Id.* at PageID.601.)

In October 2014, Plaintiff was discharged from physical therapy. (ECF No. 11-10, PageID.557.) Plaintiff's strength rating for hip flexion and extension, knee flexion and extension, and dorsi flexion was generally 4/5 on left and right, except it was 3/5 for both right hip extension and right dorsiflexion. (*Id.*) The physical therapist reported that Plaintiff complained of constant numbness in bilateral lower extremities and intermittent numbness in the upper extremities. (*Id.*) Plaintiff reported increased balance when he has shoes on. (*Id.*) The physical therapist reported Plaintiff partially met long-term goals of improving strength, improving balance, and improving holding muscle contraction; Plaintiff met goals of independence in home program and improving balance. (*Id.* at PageID.558.) In addition, Plaintiff underwent an MRI of his brain in October. (ECF No. 11-11, PageID.614.) Plaintiff had stable areas of demyelination compared to April 2014, and no abnormal enhancement or active demyelination process seen. (*Id.*) Similarly, an MRI of Plaintiff's cervical spine revealed "there is a focus of demyelination and volume loss of the posterior position later

cord centered at approximately C2-3 stable compared to prior study from February 2012. This is stable. No active demyelination / enhancement. No new lesions. Spondylosis at C3-4 with neural foraminal narrowing similar compared to prior." (*Id.* at PageID.612.)

Plaintiff had appointments with Dr. Potts in December 2014 (ECF No. 11-13, PageID.719–24), June 2015 (*id.* at PageID.716–18), January 2016 (*id.* at PageID.709–15), and July 2016. (*Id.* at PageID.702–08.) Plaintiff had a diagnosis of neuromyelitis optica in January 2016. (*Id.* at PageID.712.) Plaintiff complained of dizziness, fatigue, gait instability, headache, nausea, and vision change. (*See, e.g., id.* at PageID.702, 709, 716.) He also complained of muscle weakness. (*Id.* at PageID.710.) Plaintiff reported falling and sustaining face lacerations and stated he was falling more frequently with muscle weakness in his legs. (*Id.* at PageID.702.) In contrast, he denied arthralgias, stiffness, numbness, dizziness, weakness, anxiety, and panic attacks. (*Id.* at PageID.703, 710, 717, 719–20.) He had normal gait, deep tendon reflexes, muscle strength, and behavior. (*Id.* at PageID.705, 712, 722.)

In February 2015, with Dr. Khalil Nasrallah, Plaintiff reported experiencing normal motor strength throughout, no pronator drift, no sensory loss, and normal gait. (ECF No. 11-11, PageID.593.) Plaintiff was doing well on current medication with no recent flare ups or evidence of active demyelinating lesions since the last MRI. (*Id.*) Plaintiff has missed medication on occasion. (*Id.*) Plaintiff continues to have chronic back pain and has not tolerated certain medication in the past. (*Id.*) Plaintiff's impression was relapsing remitting multiple sclerosis and chronic back pain and extremity parestheias. (*Id.*) Similar reports and findings also occurred in July 2015. (*Id.* at PageID.589–90.)

From July to September 2015, Plaintiff received treatment through McLaren Bay Region Pain Management Center. (ECF No. 11-10, PageID.553–56.) Plaintiff received a treatment plan of medication for chronic pain syndrome with generalized neuropathy and multiple sclerosis in remission. (*Id.*) Plaintiff had some weakness in the upper and lower extremities, with 3/5 strength rating for most muscles. (*Id.* at PageID.556.) Plaintiff complained of pain on the right side of back, which varied from day to day, and diminished deep tendon reflexes. (*Id.*)

In September 2015, Plaintiff was evaluated by Dr. Rany Aburashed. (ECF No. 11-10, PageID.547–50.) Plaintiff complained of vision disturbance, paresthesias, incoordination, limb weakness, limb spasticity, dizziness, and loss of balance. (*Id.* at PageID.547.) Additionally, Plaintiff complained of fatigue, depression, difficulty concentrating, and emotional lability. (*Id.*) Physical examination revealed that he was well developed in general, normal breathing and heartbeat, muscle strength in the upper and lower extremities rated at 5/5, normal deep tendon reflexes, and he was alert and oriented. (*Id.* at PageID.549.) Plaintiff was doing "fairly well" on prescribed medication, under presumed diagnosis of multiple sclerosis. (*Id.* at PageID.550.) Plaintiff was evaluated again by Dr. Aburashed in October 2015. (*Id.* at PageID.543–46.) That physical examination was largely the same, but with results of testing, Dr. Aburashed "believe[d] [Plaintiff's] disorder is in fact neuromyelitis optica as opposed to relapsing multiple sclerosis." (*Id.* at PageID.545–46.) Plaintiff had a fall on October 3 and he complained of fatigue, decreased memory and concentration, and difficulty walking. (*Id.* at PageID.543–44.) Plaintiff was

11

to begin treatment with IVIG, and then Rituximab (depending on the results of the IVIG). (*Id.* at PageID.546.)

Plaintiff underwent MRIs of his brain, and cervical and thoracic spine in October 2015. (ECF No. 11-13, PageID.751–57.) Impressions revealed stable demyelinating plaque in the upper cervical cord, mild spinal canal stenosis at C3-C4, and stable questionable focus of diminished marrow signal in the posterior offset of T1 vertebral body. (*Id.* at PageID.752.) Plaintiff had a normal MRI examination in the thoracic spine. (*Id.* at PageID.755.) And he had a stable MRI brain examination "with no change in the extensive demyelinating process." (*Id.* at PageID.756.)

In January 2016, Plaintiff reported his vision was getting worse. (ECF No. 11-11, PageID.651.) He also reported decreased memory, difficulty concentrating, and difficulty walking. (*Id.* at PageID.652.) Dr. Aburashed stated Plaintiff had not received three IVIG infusions, was doing well clinically, and he had no relapses. (*Id.* at PageID.653.) At a six-month follow up in July 2016, Plaintiff reported falling in the prior week, visual disturbance, (*id.* at PageID.655), and worsening ambulation. (*Id.* at PageID.659.) He continued to experience numbness daily. (*Id.* at PageID.655.) Plaintiff reported two relapses, and he felt there was some benefit to the IVIG treatment, but there were times when ambulation was poor. (*Id.* at PageID.659.) Also, in July 2016, Dr. Aburashed opined[4] that Plaintiff's condition with neuromyelitis optica is disabling. (*Id.* at PageID.660.)

---

[4] Dr. Aburashed also similarly opined about Plaintiff's disability in a record from January 2016. (ECF No. 11-11, PageID.569–77.)

Plaintiff attended counseling for depression from February 2016 to March 2016. (ECF No. 11-11, PageID.630–40.) He received further counseling from April 2016 to December 2016. (ECF No. 11-16, PageID.883–904.) Following examination at this time, Plaintiff was diagnosed with depression, ADHD predominately inattentive type, global memory deficits, and global motor performance deficits. (*Id.* at PageID.897.)

Plaintiff's eye health examination report, of Dr. Lee Newton, described Plaintiff with

> [A]cuities are 20/40 in either eye with no improvement via refraction. Color vision is abnormal Patient is moderate to highly photosensitive. He feels the condition involves transient exacerbations in which [his] vision is even worse. Dilated retinal examination is unremarkable and optic nerves are of good caliber and color.

(ECF No. 11-11, PageID.578.) Further, a baseline optical coherence tomography evaluation did not show "any thinning of the retinal nerve fiber layer compared to age-matched norms." (*Id.*)

Plaintiff continued follow-up appointments with Dr. Aburashed in November 2016. (ECF No. 11-14, PageID.775–78.) Plaintiff continued with visual disturbance (both painful and blurring), and he had stress-related marital and financial issues. (*Id.* at Page.775.) IVIG treatment continued, and he was doing well. (*Id.*) Plaintiff complained of fatigue, visual disturbances and loss, difficulty concentrating, difficulty walking, and numbness. (*Id.* at PageID.776.) Plaintiff continued to be well developed, with clear heart and lung sounds, 5/5 bilateral upper and lower extremity strength, and with normal deep tendon reflexes. (*Id.* at PageID.777.) Similar reports were made following follow-up appointments in March 2017 and September 2017. (*Id.* at PageID.768–74.) Plaintiff had no relapses reported in

November 2016. (*Id.* at PageID.778.) Plaintiff reported struggling with stress at home. (*Id.*) In March 2017, Plaintiff reported an episode in the prior month, where he experienced dizziness, blurred vision, and diplopia, but no vision loss, for about a week. (*Id.* at PageID.771.) IVIG infusions continued, and Plaintiff was doing well. (*Id.* at PageID.773.)

Plaintiff underwent MRIs in August 2016 (brain and cervical spine) and March 2017 (brain). (ECF No. 11-17, PageID.907–13.) Plaintiff's brain MRIs showed no new plaques and stable-appearing multiple sclerotic plaques in August (*id.* at PageID.911), and at least one new plaque in March (*id.* at PageID.909). Plaintiff's cervical spine MRI showed stable-appearing multiple sclerotic plaque at C2-C3 and no active plaque. (*Id.* at PageID.913.) There was stable-appearing cervical spondylotic changes at C3-C4 resulting in moderate left and mild right foraminal stenosis. (*Id.* at PageID.913.)

In July 2017, Plaintiff presented to Dr. Potts regarding impaired fasting glucose, well man exam, and depression screening. (ECF No. 11-15, PageID.812.) Plaintiff denied fatigue, arthralgias, numbness, headache, or weakness. (*Id.* at PageID.813.) Plaintiff was well developed, had clear breathing, a normal heartbeat, a normal gait, and normal deep tendon reflexes. (*Id.* at PageID.814–15.) A similar result of a review of systems and physical examination occurred in September 2017 with Dr. Aburashed, but Plaintiff reported fatigue, blurred vision, diplopia, and visual changes. (ECF No. 11-14, PageID.768–70.) However, Dr. Aburashed noted that "[Plaintiff] continues to struggle with multiple symptoms including difficult with his bilateral hands in addition to severe fatigue and visual disturbances." (*Id.* at PageID.770.) Dr. Aburashed called an MRI "concerning" as it showed new lesions. (*Id.*)

14

In September 2017, Dr. Aburashed wrote a treating source statement that Plaintiff's neuromyelitis optica was disabling as a listed impairment. (ECF No. 11-13, PageID.758–59.)

Plaintiff presented to state agency doctor Robert Nelson, M.D. on August 15, 2014. (ECF No. 11-4, PageID.178–86.) Dr. Nelson listed Plaintiff's severe impairment as multiple sclerosis. (*Id.* at PageID.181.) He determined Plaintiff had exertional limitations of occasionally lifting up to 20 pounds and frequently carrying up to 10 pounds. (*Id.* at PageID.182.) Plaintiff could stand/walk for four hours, and sit for six hours, of an eight-hour day. (*Id.*) Plaintiff could occasionally climb stairs and ladders, kneel, crouch, crawl, and frequently balance and stoop. (*Id.* at PageID.183.) Plaintiff has no visual limitations. (*Id.*) Plaintiff was to avoid concentrated exposure to hazards. (*Id.* a PageID.184.) Dr. Nelson recommend limiting Plaintiff to sedentary work. (*Id.* at PageID.185.)

## 2.   Application Reports and Administrative Hearings

### a.   Function Reports

Plaintiff completed a function report in June 2014. (ECF No. 11-8, PageID.387.) Plaintiff stated he had MS, so he cannot perform work properly. (*Id.* at PageID.379.) He provided care for his children with the assistance of his wife. (*Id.* at PageID.380.) His condition affects his sleep because muscle spasms wake him, and pain makes it difficult to go back to sleep. (*Id.*) His condition also affects his dressing and bathing, because small buttons are hard to use, and he cannot take hot showers. (*Id.*)

Plaintiff says he needs reminders for taking medicine and for personal needs or grooming. (*Id.* at PageID.381.) Plaintiff can prepare food but is limited to microwavable

or toaster foods. (*Id.*) Plaintiff can do housework: mowing the lawn on a lawnmower; snow blowing; some laundry; and cleaning around the house. (*Id.*)

Plaintiff goes outside every day, and he travels either by walking, driving in a car, or riding as a passenger in a car. (*Id.* at PageID.382.) He shops in stores, one or two times per week, which can take an hour to do. (*Id.*) He can handle money but had difficulty with coins. (*Id.* at PageID.382–83.) He had hobbies of outdoor activities, which he now says he does not do anymore. (*Id.* at PageID.383.) He says he does not socialize anymore because he is too "worried [his] symptoms will start up." (*Id.* at PageID.384.) He will talk with other people about one or two times a month. (*Id.* at PageID.383.)

Plaintiff states his condition affects his ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, and use his hands. (*Id.* at PageID.384.) He says the distance varies regarding his ability to walk before needing to stop and rest. (*Id.*) He does not know how long he can pay attention, and he forgets instructions that were spoken to him. (*Id.*) He says stress can make his symptoms worse. (*Id.* at PageID.385.) Plaintiff does not use a cane. (*Id.*)

He is not taking any medications that cause side effects. (*Id.* at PageID.386.)

### b.    Third-Party Function Report

In July 2014, Plaintiff's wife, Jenna Zander, completed a third-party function report. (*Id.* at PageID.397.) Ms. Zander described Plaintiff's condition as Plaintiff "[b]ecomes easily fatigued after physical and mental exertion, concentration & focus is limited, short term memory is terrible. Frequently complains of nerve pain & burning as well as muscle spasms. He is often moody, irritable and withdrawn. The nature of his symptoms are very

unpredictable." (*Id.*) She described Plaintiff's typical day as including taking medications, caring for the kids, light housework, eating, naps, watching television. (*Id.* at PageID.391.)

She described how Plaintiff cared for their children: he would fix simple meals, get them dressed, change diapers, and put them down for naps. (*Id.*)

She stated Plaintiff was more active and enjoyed hobbies before his current conditions. (*Id.*) Plaintiff also wakes frequently because of muscle spasms. (*Id.*) He has trouble with small buttons on shirts and with hot showers. (*Id.*) He needs reminders for personal needs, grooming, and taking medicine. (*Id.* at PageID.392.) His meal preparation includes toaster foods, cereal, microwavable foods, leftovers, and sandwiches; previously, he would cook and use the kitchen more. (*Id.*)

She stated Plaintiff does light housework and mows the lawn with a riding mower—all depending on how Plaintiff is feeling. (*Id.*) Sometimes Plaintiff needs encouragement to complete work, and sometimes Plaintiff does not do any housework because of "extreme fatigue." (*Id.* at PageID.392–93.)

She stated Plaintiff goes outside daily, but not in the heat of the day. (*Id.* at PageID.393.) He can drive alone, or he will be a passenger in a car. (*Id.*) He can shop for basic groceries with a list, otherwise he can forget. (*Id.*) He can handle money. (*Id.*)

She stated Plaintiff hobbies included listening to music, watching TV, cooking, camping, fishing, and bike riding. (*Id.* at PageID.394.) But with his current conditions, he no longer does those things, except music and TV. (*Id.*) Plaintiff does not go out other than

to visit with family. (*Id.*) She stated Plaintiff is more irritable, they have more arguments, and that Plaintiff is "more withdrawn and introverted." (*Id.* at PageID.395.)

She stated Plaintiff's condition affects his ability to lift, stand, remember, complete tasks, concentrate, follow instructions, use hands, and get along with others. (*Id.*) Plaintiff can only pay attention for short periods of time. (*Id.*) He can follow basic written instructions and is overwhelmed by complex instructions. (*Id.*) He does poorly with spoken instructions because he has difficulty remembering what was said. (*Id.*) He does not handle stress well, as it "seems to bring on flare ups / symptoms." (*Id.*) He does not handle changes in routine well, and he is more fearful about the progression of disease and his symptoms. (*Id.*) He does not use a cane. (*Id.*)

She had final remarks that indicated Plaintiff's symptoms are most evident when he overexerts himself, is under emotional stress, or the weather is hot or humid. (*Id.* at PageID.397.) He has good days and bad days, but he often becomes extremely fatigued. (*Id.*)

### c.   Plaintiff's and his Father's Testimony at the Administrative Hearing (February 21, 2018)

Plaintiff stated he has not worked or searched for work since January 2014. (ECF No. 11-2, PageID.85.) He had previous work, most recently, building maintenance and masonry. (*Id.* at PageID.86–88.) He had 20 years of experience with masonry work at his parents' business. (*Id.* at PageID.90.) Plaintiff explained he went to Memorial Neurological Institute for treatment, and the Cancer Institute/Infusion Center for Rituximab. (*Id.* at PageID.90–92.) Plaintiff was unsure of his last NMO antibody testing date. (*Id.* at

PageID.93–94.) Plaintiff stated he uses marijuana once or twice a week, and he possesses a medical marijuana card. (*Id.* at PageID.94.)

Plaintiff explained that he can get blurred vision or double blurred vision, and when he is driving, he must pull over to wait for the condition to pass. (*Id.* at PageID.105.) He drives daily to take his kids to school. (*Id.*) He prepares microwavable foods, cereals, and "easy stuff" for food for the kids. (*Id.* at PageID.106–07.)

Plaintiff experiences blurred double vision at least once a week for about an hour. (*Id.* at PageID.107–08.) He said that after his vision comes back "then I'll have it a few different times throughout the day." (*Id.* at PageID.108.) He said he drops things all the time. (*Id.*) And things are "[p]robably the same, if not getting worse." (*Id.*)

Plaintiff explained that his ability to balance varied with his symptoms. (*Id.* at PageID.110.) When he is about to experience a fall, Plaintiff will grab something to balance. (*Id.* at PageID.111.) He experiences random sharp pains. (*Id.*) He cannot tolerate hot water. (*Id.* at PageID.112.) And he stated he has problems with memory and paying attention. (*Id.* at PageID.112–13.) He is off medication for ADHD so that it would not interfere with other treatment. (*Id.* at PageID.113.)

Plaintiff's father Patrick Zander testified at the hearing. (*Id.* at PageID.95–104.) Mr. Zander stated that Plaintiff lives with him part of the time. (*Id.* at PageID.95.) He explained that in the process of Plaintiff's divorce, Plaintiff takes care his two kids for part of the week, and Plaintiff's wife will care for the kids for the other part of the week. (*Id.* at PageID.96.) When Plaintiff's wife is caring for the kids, Plaintiff is with his parents. (*Id.*) Mr. Zander said that he and Plaintiff's mother help Plaintiff with care for his kids, or

19

Plaintiff has another daughter that will help too. (*Id.*) Mr. Zander said most of the time, their help is provided on the weekend, but they are available if Plaintiff has problems. (*Id.* at PageID.97.) He stated Plaintiff gets the kids to school and brings them home. (*Id.*) He will get the kids dinner and get them ready for bed. (*Id.*)

For the frequency of during-the-week assistance for Plaintiff, Mr. Zander said that they are called during flare-ups, which happen a couple of times a month. (*Id.* at PageID.98.) When Mr. Zander was called for assistance, he would find Plaintiff "tired, maybe disoriented, shaky . . . he just sometimes loses his motor skills." (*Id.* at PageID.99.) Mr. Zander further described this as "[h]e was laying on the couch; he was basically exhausted. He could hardly get out of the couch, and he needed help with the kids." (*Id.* at PageID.100.) Plaintiff never told Mr. Zander about any reconsideration of custody of the kids. (*Id.*)

Mr. Zander said, "[y]es[,]" there are problems with Plaintiff's jitteriness or problems with coordination with hands or arms. (*Id.* at PageID.102.) He explained further that was why Plaintiff was laid off from his business; he said "I had to lay him off because I couldn't jeopardize the rest of the people working for me" by Plaintiff's dropping tools and bricks when working on scaffolding. (*Id.*) Mr. Zander saw Plaintiff's problems with fatigue in the form of Plaintiff sleeping for a couple hours during the day to "recharge." (*Id.*)

### d.   Plaintiff's Wife's Testimony at the Administrative Hearing (March 15, 2016)

Plaintiff's wife, Jenna Zander, testified as a witness at Plaintiff's administrative hearing on March 15, 2016, which in this instance occurred before the first Appeals

Council's decision remanding this case to the Administrative Law Judge. (ECF No. 11-3, PageID.157–61; ECF No. 11-4; PageID.210–11.)

Ms. Zander indicated that Plaintiff, since 2014, had become withdrawn, argumentative, and his mood was very labile. (ECF No. 11-3, PageID.158.) He had problems in the mornings with stumbling and losing balance. (*Id.*) He seemed to be depressed, and she was afraid to leave him alone. (*Id.*)

Briefly, Ms. Zander confirmed the questions and observations of the ALJ on Plaintiff's earlier testimony. (*Id.* at PageID.160.) Ms. Zander agreed that Plaintiff does some things around the house: mowing the yard, snow blowing, caring for the two kids, laundry, and dishes. (*Id.*) She further explained that the snow blower is self-propelled, and Plaintiff takes frequent breaks. (*Id.*)

### e. The Vocational Expert's ("VE") Testimony at the Administrative Hearing

The VE considered Plaintiff's work experience and she identified Plaintiff's past work as janitor (*DOT*[5] 382.665-010, SVP 3, medium per *DOT*, heavy as performed) and mason apprentice (*DOT* 844.364-014, SVP 7, heavy per *DOT* and as performed). (*Id.* at PageID.115.) The ALJ then inquired about a hypothetical person of Plaintiff's age and education with the following limitations.

> I'd like you to further assume that the hypothetical individual is able to lift and/or carry no more than ten pounds at a time, and can occasionally lift or carry articles such as docket files, ledgers, and small tools.
>
> The hypothetical individual can stand and/or walk for two hours per eight-hour workday, and can sit for eight hours per eight-hour workday.

---

[5] *Dictionary of Occupational Titles*

Such a hypothetical individual can frequently, as opposed to constantly reach, finger and feel bilaterally.

Such a hypothetical individual can occasionally climb ramps and stairs, and can never climb ladders, ropes, or scaffolds.

The hypothetical individual can frequently balance as that term is defined in the DOT, and can frequently stoop.

The hypothetical individual can occasionally kneel and crouch, but can never crawl.

The hypothetical individual is unable to work at a production-rate pace such as on an assembly line; should never be exposed to dangerous machinery, hazardous heights, or extreme heat.

The hypothetical individual is unable to perform work involving the use of color vision, and is unable to perform in a work setting that has spot lighting such as in a concert setting.

The hypothetical individual is able to carry out simple instructions.

And the hypothetical individual is able to handle large objects,[6] not small ones.

(*Id.* at PageID.115–17.) The VE stated that individual could not perform the two jobs identified earlier, or generally performed in the national economy. (*Id.* at PageID.117.) The VE identified the following unskilled sedentary jobs capable of being performed under this hypothetical: bench assembler (*DOT* 726.685-066, SVP 2, 110,000 jobs nationally), inserter (*DOT* 713.687-026, SVP 2, 90,000 jobs nationally), and parts checker (*DOT* 669.687-014, SVP 2, 75,000 jobs nationally). (*Id.* at PageID.117–18.) The VE identified

---

[6] The ALJ later defined large objects as "greater than two inches in size." (ECF No. 11-2, PageID.117.)

22

that her testimony is consistent with the *DOT*, but noted the *DOT* does not address object size or spot lighting. (*Id.* at PageID.118.)

Plaintiff's counsel asked the VE about Plaintiff's condition of vision blurriness, and if that caused an unscheduled one-hour break per week, whether that would be work-preclusive. (*Id.*) The VE said "I don't believe they would [tolerate that] if it were on a regular, ongoing basis." (*Id.*) Counsel asked the VE about regular, non-injury-sustaining falls by the individual, and VE's response was that some employers could try to make accommodations, but "[e]ven in an office type environment that becomes hazardous." (*Id.* at PageID.119.) Finally, Counsel asked the VE about fatigue-induced breaks (by lying down) that occur for an hour and two times per week, and the VE responded that would be work-preclusive. (*Id.*)

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. §§ 404.1513 (amended March 27, 2017), 416.913 (amended March 27, 2017). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* §§ 404.1513(a), 416.913(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* §§ 404.1513(d), 416.913(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of

opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id*. When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. §§ 404.1527 (eff. Sept. 3, 2013 to Mar. 26, 2017), 416.927 (eff. Aug. 24, 2012 to Mar. 26, 2017). Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* §§ 404.1527(d), 416.927(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. *Id.* §§ 404.1527(c) (eff. Sept. 3, 2013 to Mar. 26, 2017), 416.927(c) (eff. Aug. 24, 2012 to Mar. 26, 2017). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540–42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed her claim before March 27, 2017, she is entitled to the benefit of the treating-source rule. Under that rule, certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and

laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. §§ 404.1527(d), 416.927(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640–41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

The claimant must provide evidence establishing his or her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

According to SSR 16-3p, an ALJ must analyze the consistency of the claimant's statements with the other record evidence, considering his or her testimony about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in the Social Security Ruling. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). This analysis and the conclusions drawn from it—formerly termed a credibility determination—can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 16-3p, 2016 WL 1119029, at *2 (March 16, 2016). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 16-3p, 2016 WL 1119029, at *2 (March 16, 2016); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 16-3p, 2016 WL 1119029, at *6 (March 16, 2016).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071) (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he

or she is] disabled." 20 C.F.R. § 404.1529(a). The absence of objective, confirming evidence obligates the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measure . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3), 416.929(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039–40 (6th Cir. 1994); SSR 16-3p, 2016 WL 1119029, at *7 (March 16, 2016).

### G.    Arguments and Analysis

In this case, Plaintiff presented two particular arguments about the proper analysis given to certain record evidence, and whether proper procedure was followed regarding the same record evidence. Because the two arguments touch on the same evidence in the sequence of events under 20 C.F.R. § 404.1527, they will be addressed together, below.

> **1.    Under 20 C.F.R. § 404.1527(c)(2), the Commissioner[7] erred in the analysis of the treating neurologist's opinions of July 2016 and September 2017; and**
>
> **2.    The Commissioner erred in failing to provide "good reasons" in evaluating the neurologist's treating-source opinion.**

As explained earlier, at the time Plaintiff filed his application for DIB, the treating-source rule still applied. Accordingly, a treating source's medical opinion is given controlling weight when it "is well-supported by medically acceptable clinical and

---

[7] "Where the Appeals Council denies review, the ALJ's decision stands as the Commissioner's final decision." *Kaddo v. Comm'r of Soc. Sec.*, 238 F. Supp.3d 939, 942 (E.D. Mich., 2017). Hereinafter, the decision, and specifically the underlying opinion supporting it, will be identified as the ALJ's opinion.

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record . . . ." 20 C.F.R. § 404.1527(c)(2). Plaintiff argues there was no meaningful analysis of two of Dr. Aburashed's opinions, thus substantial evidence would not support the ALJ's conclusion that Plaintiff was not disabled. I suggest that on this point, Plaintiff is correct. Similarly, Plaintiff argues that the Commissioner erred in failing to provide "good reasons" in evaluating the neurologist's treating source opinion. I suggest that on this point, Plaintiff is also correct.

Initially, it must be noted that in the process of determining the weight given to a medical opinion, an ALJ considers six factors: the examining relationship, the treatment relationship, supportability of the opinion, the consistency of the medical opinion with the record as a whole, specialization of the treating source, and other relevant factors. 20 C.F.R. § 404.1527(c). However, "The ALJ need not perform an exhaustive, step-by-step analysis of each factor; she need only provide 'good reasons' for both her decision not to afford the physician's opinion controlling weight and for her ultimate weighing of the opinion." *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 785 (6th Cir. 2017) (citation omitted). Further, an "ALJ must include a discussion of findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record. The reasons requirement is both a procedural and substantive requirement, necessary in order to facilitate effective and meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).

The ALJ gave little weight to two opinions of Dr. Aburashed. The ALJ stated

In his July 2016 treatment note, Dr. Aburashed recommended the [Plaintiff] not work moving forward given the fluctuant nature of his disorder. (Exs. C15F, pg. 11; C22F, pg. 17). On July 25, 2016, Dr. Aburashed opined the [Plaintiff] had significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements or [sic] gait and station. The doctor noted the [Plaintiff] has NMO with relapses. He stated the [Plaintiff] needs disability due to significant difficulty with occasional gait issues. He noted the [Plaintiff] also has significant spasms and fatigue. Dr. Aburashed opined the [Plaintiff] would need to lie down at unpredictable intervals due to the fatigue. He stated the [Plaintiff] has six to ten hours of severe fatigue per day and he is unable to work. The doctor opined the [Plaintiff] has significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity. He stated the [Plaintiff] has 4/5 muscle strength. He noted the [Plaintiff] cannot walk long distances due to increased fall risk. (Ex. C15F, pg. 12). This opinion is not supported by his own objective examination findings (Ex. C4F; C22F). The longitudinal record for the period at issue shows that the [Plaintiff] has had some relapses, but that he has also responded well to treatment. Dr. Aburashed's opinion is also inconsistent with other objective examination findings (e.g. C23F/23-25, 31-33). Additionally, this opinion is not consistent with the [Plaintiff's] reported activities of daily living. The undersigned gives little weight to this opinion.

On September 18, 2017, Dr. Aburashed opined the [Plaintiff] has disorganization of motor function in two extremities described as an interference with movement of two extremities due to a neurological disorder resulting in an extreme limitation, as well as an inability to maintain balance in a standing position and an inability to use his upper extremities. The doctor stated the [Plaintiff] has NMO, which causes episodic blindness and gait dysfunction and weakness. He noted that during an attack, the [Plaintiff] cannot walk or sit due to ataxia and he will have weakness in his hands. The doctor opined the [Plaintiff] will need to lie down for two to six hours during an eight-hour workday due to fatigue. Dr. Aburashed opined the [Plaintiff] has a marked limitation in physical functioning, as well as marked limitations in interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing himself. The doctor stated the [Plaintiff] has increased anxiety and depression and decreased cognition, as well as emotional lability. (exs. C20F; C24F). This opinion is not supported by his own objective examination findings. (Ex. C4F; C22F). In particular, the [Plaintiff's] physical findings at his last two appointments with the doctor, in March 2017 and in September 2017, were generally unremarkable. The longitudinal record for the period at issue shows that the [Plaintiff] has had some relapses, but that he has also responded well to treatment. Dr. Aburashed's opinion is

> also inconsistent with other objective examination findings (e.g., C23F/23-25, 31-33). Additionally, this opinion is not consistent with the [Plaintiff's] reported activities of daily living. The undersigned gives little weight to this opinion, beyond what is reflected in the above residual functional capacity.

(ECF No. 11-2, PageID.63.) In summary, the ALJ gave little weight to the opinion of Dr. Aburashed because of physical findings at two doctor appointments, other objective examination findings—citing longitudinal record of relapse and response to treatment, and records of Dr. Jeffery Potts—and Plaintiff's activities of daily living.

The ALJ appears to focus on certain aspects of Plaintiff's condition—for example, the 5/5 muscle strength, no muscle atrophy, sensation to light touch, normal deep tendon reflexes, normal gait and posture, no tremors (more fully stated at ECF No. 11-2, PageID.59)—and asserting that "[t]hese findings are not consistent with the claimant's complaints of disabling symptoms . . . ." (ECF No. 11-2, PageID.59–60).

On the surface, the reasons for the ALJ's decision appear to be clear, but upon review of the whole record, the absence of analysis of certain factors leaves me unable to meaningfully provide judicial review. Plaintiff has a treating relationship with Dr. Potts and Dr. Aburashed that goes back a number of years. Dr. Potts never opined as to Plaintiff's disability status, but Dr. Aburashed did so. Dr. Aburashed is an MS specialist (s*ee* ECF No. 11-11, PageID.589), and there is no information regarding Dr. Potts' specialization. Fatigue is a common and regular complaint[8] of Plaintiff. The ALJ appears to analyze the fatigue in the context of physical examinations and daily living activities; there, the

---

[8] *See, e.g.*, ECF No. 11-2, PageID.102; ECF No. 11-8, PageID.397; ECF No. 11-10, PageID.516, 544, 548; ECF No. 11, PageID.600; ECF No. 11-13, PageID.702, 709, 716; ECF No. 11-14, PageID.769, 770, 776, 780. *But see* ECF No. 11-15, PageID.813.

fatigue's weight is reduced because it is said to be inconsistent with those contexts. But what if they are consistent? Given the prevalence in the record of reported fatigue under Plaintiff's neuromyelitis optica, a lack of explanation about how Plaintiff's fatigue is inconsistent[9] with his daily living activities, and the lack of explanation for not giving more weight to a treating specialist, that question cannot be answered here. Without the ALJ's review of this record and a proper analysis of the record and its appropriate weight, judicial review is not possible. *See Lowery v. Comm'r of Soc. Sec.*, 55 F. App'x 333, 339 (6th Cir. 2003) ("[A]n 'ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning.'") (quoting *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir., 1995)).

In response to Plaintiff's argument, the Commissioner argues that Dr. Aburashed's opinions on other conditions—such as Plaintiff not meeting Listing 11.09; sustained disturbance of gross and dexterous movements; fatigue of motor function and muscle weakness; maintaining concentration, persistence or pace—are not consistent with objective physical examination findings. The Commissioner appears to suggest that Plaintiff has various capabilities maintained through his conditions and, correspondingly, that the RFC is appropriate for the most that Plaintiff is capable of doing. The Commissioner's argument misses the mark in that it does not address Plaintiff's fatigue-

---

[9] There is no explanation for how Plaintiff's activities of daily living, with the record's description of Plaintiff being able to do various ordinary household chores occasionally within the limits of his fatigue, is consistent with a regular and continuing basis of an eight-hour workday and five-day workweek. *See* SSR 96-8p.

related conditions and assumes without explaining that Plaintiff's fatigue is inconsistent with the objective physical evidence.

Next, the ALJ must provide "good reasons" in the "decision for the weight [given to Plaintiff's] treating source's medical opinion. 20 C.F.R. § 404.1527(c)(2). Plaintiff argues the ALJ failed to do so. Again, I suggest that Plaintiff is correct.

The cited reasons for the weight given are as follow: For the January 28, 2016 Dr. Aburashed opinion:

> This opinion is not entirely consistent with the [Plaintiff's] physical examination findings, which showed generally full muscle strength, intact sensation, no muscle atrophy, negative Romberg testing, and normal gait with treatment (e.g., C11F; C22F). There was no pronator drift or ataxia noted. The [Plaintiff] did not use an assistive device for ambulation. Additionally, although the [Plaintiff] reported having some falls, once the [Plaintiff] started and responded to treatment, his fall risk decreased. He showed improvement with treatment and a generally stable disease process. The undersigned therefore gives only partial weight to this opinion . . . .

(ECF No. 11-2, PageID.62.) For the July 2016 opinion of Dr. Aburashed, the reasons given were:

> This opinion is not supported by his own objective examination findings (Ex. C4F; C22F). The longitudinal record for the period at issue shows that the [Plaintiff] has had some relapses, but that he has also responded well to treatment. Dr. Aburashed's opinion is also inconsistent with other objective examination findings (e.g. C23F/23-25, 31-33). Additionally, this opinion is not consistent with the [Plaintiff's] reported activities of daily living. The undersigned gives little weight to this opinion.

(*Id.* at PageID.63.) For the September 18, 2017 opinion of Dr. Aburashed, the reasons given were:

> This opinion is not supported by his own objective examination findings (Ex. C4F; C22F). In particular, the [Plaintiff's] physical findings at his last two appointments with the doctor, in March 2017 and in September 2017, were

generally unremarkable. The longitudinal record for the period at issue shows that the [Plaintiff] has had some relapses, but that he has also responded well to treatment. Dr. Aburashed's opinion is also inconsistent with other objective examination findings (e.g. C23F/23-25, 31-33). Additionally, this opinion is not consistent with [Plaintiff's] reported activities of daily living. The undersigned gives little weight to this opinion . . . .

(*Id.*)

In general, one can observe Plaintiff's usually unremarkable physical examination findings in the medical record. But the focus and weight given to that aspect of the record begs the question of Plaintiff's disability. Further explanation is needed to explain why these records are inconsistent with Dr. Aburashed's opinions. For example, when Plaintiff reported fatigue and staggering and difficulty ambulating to Dr. Al-Qasmi in September 2014, Dr. Al-Qasmi was unsure if this was an MS flare up or surgical infection. (ECF No. 11-11, PageID.600–01.) Or in February 2015, with Dr. Nasrallah, Plaintiff denied symptoms suggestive of a flare up (when Plaintiff was still being treated for MS). (*Id.* at PageID.592.). Or when Plaintiff was treated for NMO with Dr. Aburashed, his IVIG treatments also coincided with two relapses (ECF No. 11-14, PageID.782), no relapses (*id.* at PageID.778), an episode of vision blurring (*id.* at PageID.773), and continued struggle with severe fatigue and visual disturbances. (*Id.* at PageID.770.) These records show some consistency with Dr. Aburashed, rather than inconsistency; more explanation is needed to explain the inconsistency. Further, there is no explanation, other than an alleged consistency, to give Dr. Potts observations or opinions an equivalency to that of a neurological specialist like Dr. Aburashed. Finally, there is no explanation as to how

33

Plaintiff's living activities are inconsistent with Dr. Aburashed's opinion, other than an assumption that premise is true.

Here, this analysis is similar to this observation and reasoning in *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 380 (6th Cir. 2013): "In the end, a proper analysis of the record might not support giving controlling weight to the opinions of Dr. Onady. But this circuit 'has made clear that [it] do[es] not hesitate to remand when the Commissioner has not provided good reasons for the weight given to a treating physician's opinion.'" (quoting *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011)).

For these reasons, remand is appropriate for further explanation of the reasons for the ALJ's decision.

### 3.     The RFC Assessment fails to consider Plaintiff's fatigue and visual disturbances.

Plaintiff argues that the RFC Assessment—the questions the ALJ posed to the VE at step five—fail to consider Plaintiff's fatigue and visual disturbances. Plaintiff is correct.

The VE's responses to the ALJ's questions provide substantial evidence that Plaintiff is able to perform other work, if the questions "accurately portray a [Plaintiff's] physical and mental impairments. Hypothetical questions, however, need only incorporate those limitations which the ALJ has accepted as credible." *Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 865 (6th Cir. 2011) (citations and internal quotation marks omitted). "An improper hypothetical question cannot serve as substantial evidence under § 405(g), and can result in a remand or reversal." *Edwards v. Barnhart*, 383 F.Supp.2d 920, 931 (E.D. Mich. 2005) (citing *Whitmore v. Bowen*, 785 F.2d 262 263–64 (8th Cir. 1986).

In this case, the ALJ's questions to the VE do not specifically mention Plaintiff's fatigue or the visual impairments appropriately. Presumably, the ALJ limited Plaintiff to sedentary work in light of Plaintiff's severe impairments, which include fatigue symptoms. Yet, as discussed above, the record reflects fatigue largely throughout, and the ALJ did not inquire of any fatigue-related limitation.[10] Specifically, there was no consideration of Dr. Aburashed's September 2017 statement which included a limit that Plaintiff needs to lie down for two–six hours daily (ECF No. 11-13, PageID.759), of Plaintiff's father's statements of him assisting Plaintiff with caring for Plaintiff's children a couple of times a month when Plaintiff "could hardly get out of the couch" (ECF No. 11-2, PageID.98, 100), and Plaintiff's statement that he needed an hour break at least three times a month (*id.* at PageID.110), to name a few instances. Also, the ALJ limited Plaintiff with two overt visual limitation—no spot lighting and no work requiring color vision—though the Commissioner posits that other limitations incorporate visual limitations as well. There is no explanation in the record that connects these limitations—handling no small objects and not working at a production-rate pace—to the visual limitations at issue. Further "'counsel's argument cannot cure a deficient opinion by offering explanations never offered by the ALJ' because 'arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by the [ALJ] rather than counsel's 'post hoc rationale' that is under the Court's consideration.'" *Hutchinson v. Comm'r of Soc. Sec.*,

---

[10] If one accepts the ALJ's analysis, that Plaintiff's fatigue-related symptoms are inconsistent with the otherwise unremarkable physical examinations, then perhaps the absence of fatigue-related questions is understandable. However, with the reasons set forth in the earlier arguments, the ALJ had not presented proper analysis or good reasons for the interpretation or weight of certain medical records related to Plaintiff's NMO and the attendant fatigue issues.

2014 WL 2050859 at *7 (E.D. Mich 2014) (quoting *Oddo v. Astrue*, 2012 WL 7017622 (N.D. Ohio 20120)).

The Commissioner also argues that Plaintiff has not explained what additional restrictions are needed in the RFC, thus he fails to meet the burden of proof, under *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008). However, given the record of this case—such as the cited record above of Dr. Aburashed and Plaintiff's and Plaintiff's father's testimony, and further, the VE's response to Plaintiff's need for certain regular hour-long breaks—the additional restriction would correspond with Plaintiff's need for those hour-long breaks, which was not considered previously by the ALJ.

Should further explanation of the ALJ's decision render a different view of the weight and application of the medical opinion evidence, then additional hypothetical limitations at step five may be warranted. For these reasons, remand is the appropriate remedy here.

### H.    Conclusion

For these reasons, I would conclude that substantial evidence does not support the Commissioner's denial of benefits, and I recommend **GRANTING** Plaintiff's Motion, (ECF No. 14), **DENYING** the Commissioner's Motion, (ECF No. 15), and remanding the case pursuant to sentence four of 42 U.S.C. § 405(g).

## III.    <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may

respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  October 23, 2020                              S/ PATRICIA T. MORRIS
                                                     Patricia T. Morris
                                                     United States Magistrate Judge